IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 09-CR-30047 |
| DERRICK E. DAVIS, | ) ) ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant's Motion to Suppress Evidence and Quash Arrest (d/e 22) (Motion to Suppress).  The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. See Text Order, dated November 23, 2009.  After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

### I.  BACKGROUND[1]

Defendant Derrick Davis (hereinafter Davis or the Defendant) is charged in a one-count Indictment (d/e 5) as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Based upon the testimony heard in open court on

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

December 9, 2009, Davis encountered law enforcement officials on October 21, 2008, while a passenger in a vehicle owned by his mother. On the evening of October 21, 2008, officers of the Jacksonville, Illinois Police Department, specifically Sergeant Shawn Walker, Detective Brad Rogers, and Officers Olivia Brune and Kyle Crumley, were conducting surveillance as a part of the drug response team. The officers were focusing on known drug areas in Jacksonville. Five days prior, the officers had conducted a controlled drug purchase from a man named Shawn Meredith at a home on Beecher Street in Jacksonville. The confidential source involved in the transaction told police that Meredith had video surveillance equipment set up in his house and might have weapons.

On October 21, 2008, Officer Brune was driving an unmarked vehicle and Sgt. Walker was her passenger. At approximately 9:50 p.m., Brune was stopped at the corner of College and Church Streets in Jacksonville when she observed a white Cadillac approach the intersection from the north on Church Street and turn west onto College. Officer Brune recognized the car as belonging to Justin Davis, and she observed Justin Davis driving the car. The front seat passenger was somewhat reclined, but Brune believed it to be Shawn Meredith. Brune had seen the Cadillac the prior evening parked outside of Meredith's home.

Officer Brune followed the Cadillac as it turned onto East Street and then proceeded past Beecher Street to Morton Avenue. Officer Brune was watching the vehicle for possible traffic violations. At Morton, she observed the Cadillac

turn east, or left, onto Morton without using a turn signal.  Brune continued to follow the Cadillac, although the configuration of Morton at the intersection with East Street made it difficult for her to pull out.  Thus, by the time Brune was driving eastbound on Morton, there were several cars between her car and the Cadillac.

Brune and Walker observed the Cadillac turn south onto Country Club Road.  Sgt. Walker telephoned Rogers and Crumley to respond as well.  Country Club Road is a loop, and Brune and Walker went farther east, past the place where the Cadillac had turned, and came in a back way.  Brune described Country Club Road as a wooded area with few residences that runs along side of a lake.  The Government presented an ariel view of the area. <u>Government's Ex. 1</u>.

Brune testified that she and Walker eventually came upon the Cadillac parked in a gravel parking area off of Country Club Road.  The area was dark and there were no overhead lights.  According to Brune, approximately three to five minutes passed from the time the Cadillac had turned onto Country Club Road until the officers encountered it again.  Brune estimated that this parking area was approximately three miles from the point at which she observed the failure to signal.  Brune pulled up to the Cadillac and parked approximately two car lengths away from it.  Rogers and Crumley arrived at the same time, also in plain clothes, in another unmarked car.

According to Brune, she and Walker approached the Cadillac on the driver's side with their flashlights drawn and pointed at the vehicle. Rogers and Crumley approached the Cadillac from the rear on the passenger side. Brune testified that there were four occupants in the car and that she saw the front seat passenger, later identified as Defendant Davis, bend forward as the officers approached. According to Brune, at this point, Walker identified the officers as Jacksonville Police and directed the people in the Cadillac to get their hands up. Everyone except for the front seat passenger complied. Brune observed the front seat passenger moving frantically and reaching down. Brune stated that she then heard Detective Rogers yell out "gun, gun," at which point she drew her weapon and pointed it at the occupants of the Cadillac. According to Brune, the Defendant was already out of the vehicle at this time. All of the other occupants of the Cadillac were subsequently removed from the vehicle and secured. On cross-examination, Brune testified that she never issued a traffic citation for the failure to signal that she had observed and that she never intended to do so. Brune further testified that, although the Cadillac had room to pull out, it was not free to do so after Walker's announcement.

Sgt. Walker testified that, as he exited the unmarked vehicle and approached the Cadillac, he shone his flashlight on the driver's face, at which point he observed the driver's lips move as if to say "Oh, fuck." Walker then observed the front seat passenger "disappear onto the floorboard." Walker

characterized the passenger's actions as a dive to the floor. Walker deemed this suspicious and yelled out "Jacksonville Police Department, show me your hands." Walker estimated that he had progressed two or three steps after exiting his vehicle at the point he yelled out.

According to Walker, three of the occupants complied, but the front seat passenger did not. Walker thought that the front seat passenger could be Shawn Meredith and, based on the information from the Confidential Source, thought that Meredith might have a gun. Walker repeated the phrase two or three times and continued to approach the Cadillac. Walker testified that he then heard Rogers yell out "gun, gun," at which point, Walker drew his weapon and pointed it at the occupants of the Cadillac. Walker did not observe Rogers and Crumley remove the Defendant from the Cadillac; however, he believes that Defendant was the first one out of the car. The occupants of the Cadillac were removed from the car, handcuffed, and placed in a marked squad car which had arrived at the scene. Walker testified that, once the occupants were secured, officers removed a Ruger revolver from the front passenger side floorboard. Walker testified that the firearm was near, but not under, the seat and would have been in the area of a seated passenger's feet. Walker further testified that he had reviewed the radio traffic from the incident. According to Walker, Crumley called in that the officers were approaching the Cadillac and then thirty seconds later Walker called in for a squad car, stating that the officers had found a gun.

Detective Rogers testified that he was doing surveillance with Officer Crumley when he received a phone call from Walker advising him about the vehicle out on Country Club Road. Rogers testified that he was advised that the Cadillac had committed a traffic violation, failure to signal, but he was not informed where this violation had occurred. Rogers, who was driving an unmarked car, approached the Cadillac and parked approximately fifteen to thirty feet away from it. Rogers and Crumley exited their vehicle and approached the Cadillac from the rear on the passenger side, with Crumley approaching first. Walker and Brune were approaching on the driver's side. Rogers testified that he heard Walker call out within seconds of exiting the vehicle, identifying the officers as Jacksonville Police and directing the occupants to put their hands up. Walker's tone heightened Rogers' awareness due to its higher pitch and excited nature. Rogers testified that he observed the Defendant leaning down to the floorboard and heard Crumley order Defendant to show his hands. Defendant, however, remained bent to the floorboard. Rogers testified that Crumley put his hands on the Defendant through the open passenger window and got the Defendant to sit up. Crumley then ordered Defendant out of the vehicle. Rogers testified that, as Defendant exited the vehicle, Rogers saw a handgun between Defendant's legs and yelled out "gun, gun" to alert the other officers. Rogers testified that he focused his attention on the floorboard based on the movements he had observed. According to Rogers, Defendant was taken out of the car and

subdued by Officer Crumley. The matter was then treated as a felony stop, and the other occupants were removed from the car and secured. The Cadillac was searched, and officers found a red coat with a cell phone and crack cocaine in the pocket.

Officer Crumley testified that, at the time of the incident, he was wearing a police radio on his person. According to Crumley, as he stepped out of the vehicle to approach the Cadillac, he advised dispatch where the officers were and what they were doing. Crumley stated that he heard Walker's announcement and then saw the front seat passenger, later identified as the Defendant, bending down. Crumley testified that Defendant's head was near his knees, below the window level of the car. As Crumley approached, he saw that the Defendant had a winter coat in his lap with a clear bottle of liquor on it which Crumley believed to be open in violation of Illinois law because the liquid was not flush with the top of the bottle. Crumley asked the Defendant to step out of the car. According to Crumley, Defendant then opened the door and stepped out, at which time Crumley heard Rogers call out "gun, gun." Crumley then took Defendant to the ground.

Zack Marburger also testified. Marburger, who is seventeen years old, stated that he knew Defendant through Defendant's brother Justin Davis. Marburger testified that, on the evening of October 21, 2008, he was with Defendant, Justin Davis, and Keenan Burnett in the Cadillac. Justin Davis was

driving, Defendant was the front seat passenger, and Marburger and Burnett were in the back seat, Marburger on the driver's side and Burnett on the passenger side. Marburger stated that the men drove out to the country at which point Marburger and Burnett smoked marijuana blunts. Marburger testified that he smoked two blunts and that marijuana makes him feel goofy. The men came back into town and eventually drove out to Country Club Road and parked. Marburger testified that while they were parked at Country Club Road, the windows of the Cadillac were up and the music was on and loud.

According to Marburger, the Cadillac had not been parked for even a minute when two cars approached it. Marburger saw individuals approaching with flashlights and tasers and was afraid. He recalled Justin Davis saying "fuck," when the cars pulled in. He heard a directive to freeze, and he put his hands up in response. Marburger did not see what the other occupants of the Cadillac were doing at this time; he was focusing on himself. Marburger did not see how Defendant exited the vehicle, but within seconds of Defendant exiting the vehicle, Marburger heard someone call out "gun, gun." Marburger testified that he was later taken to the Jacksonville Police Department, at which point he talked to Detective Rogers about the Defendant. According to Marburger, Detective Rogers told Marburger that he did not like Defendant or Defendant's father and that he wanted to give Defendant "more time." Marburger testified that he never saw a gun the night of October 21st until after he was out of the

Cadillac. Marburger denied telling the officers that Justin Davis and the Defendant fired off a couple rounds while the men were out in the country.

Justin Davis, brother of Defendant Davis, also testified. According to Justin Davis, he and the Defendant met up with Marburger and Burnett at approximately 8:45 p.m. on October 21, 2008. The men went riding in the country north of town for about an hour, during which time Burnett and Marburger consumed marijuana and Justin Davis fired off a couple rounds from the revolver. Justin Davis testified that his window was open at this point. Justin Davis also testified that the gunshots could not be heard over the music that was playing in the Cadillac although he did not have a silencer on the gun. The men returned to town, eventually driving from the intersection of Church and College out to Country Club Road. Justin Davis testified that he was driving the Cadillac during this time and that he never failed to signal because he knew he had a gun and alcohol in the vehicle. Justin Davis estimated that it was approximately four to six miles from the intersection of Church and College to Country Club Road.

Justin Davis testified that he parked the Cadillac out on Country Club Road. According to Justin Davis, the men parked there to talk and the windows of the car were up at this point. Justin Davis testified that, approximately fifteen seconds after he parked the Cadillac, two vehicles approached, moving pretty fast. The vehicles pulled in five to ten feet from the Cadillac. Justin Davis testified that he did not know what was going on and was "shocked." According

to Justin Davis, people got out of the vehicles and approached the Cadillac with flashlights and guns drawn. Justin Davis said "Oh, fuck." Justin Davis testified that, at this point, he threw the revolver to Defendant and told him to do something with it. He doesn't remember where the gun landed. Justin Davis testified that he put his hands up and did not notice what the other occupants of the Cadillac were doing. Justin Davis stated that he was removed from the car and placed on the ground, at which point someone said "gun, gun." On cross-examination, Justin Davis denied telling officers that Defendant also fired off rounds in the country. Justin Davis stated that he was the only one who fired the gun.

      Keenan Burnett's mother, Carla Hendricks, testified briefly. She stated that she picked Keenan up at the Jacksonville Police Department during the early morning hours of October 22, 2008. According to Hendricks, she talked to Detective Rogers, who told her that he hated Defendant and Defendant's father. Hendricks stated that Rogers also told her that, because a gun was involved, he was planning to go federal with the case because it would mean that Defendant would get more time.

      The Motion to Suppress asks the Court to suppress both the firearm and the cocaine seized from the automobile. At the hearing on the Motion to Suppress, defense counsel clarified that he intended to proceed on the Motion only as it related to the firearm. Defense counsel also informed the Court that

the references to the Fifth Amendment in the Motion were inadvertent and his client intended to raise only Fourth Amendment grounds.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A defendant seeking to suppress evidence because of a violation of the Fourth Amendment must first establish that he has standing to challenge the search or seizure. United States v. Sweeney, 688 F.2d 1131, 1143 (7th Cir. 1982).  Once the defendant has established standing in a case in which law enforcement officers conducted a warrantless search, the burden of proof shifts to the government, because warrantless searches are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).  At that point, the Government bears the burden of establishing by a preponderance of the evidence that an exception to the warrant requirement applies. United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

The Court turns first to the question of standing.  The Government argues that Davis is unable to meet his burden of establishing a personal Fourth Amendment interest in the Cadillac, although the Government characterizes standing as an irrelevant issue under the facts of the instant case.  It is well-

established that "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'"  United States v. Figueroa-Espana, 511 F.3d 696, 703 (7th Cir. 2007) (quoting United States v. Jackson, 189 F.3d 502, 507 (7th Cir. 1999)).  In order for Davis to establish the standing necessary to challenge the admission of evidence obtained in an allegedly unlawful search, he must first establish that he had a legitimate expectation of privacy in the Cadillac.  Davis did not own the Cadillac, but he can demonstrate standing by satisfying a two-part test, which analyzes whether he had both a subjective and an objective expectation of privacy in it.  Figueroa-Espana, 511 F.3d at 704.

As stated in open court, the Court believes that, based on the evidence presented, Davis has Fourth Amendment standing to challenge a search of the vehicle.  Specifically, the Court notes that the Cadillac was titled to Davis' mother and Davis was a regular permissive user of the vehicle.  However, as outlined below, the Court agrees that the issue of standing becomes irrelevant because the plain view doctrine justifies the seizure of the firearm.

The plain view doctrine allows for seizure of an item if (1) a law enforcement officer is lawfully present, (2) the item is in the plain view of the officer, and (3) the incriminating nature of the item is immediately apparent.  United States v. Raney, 342 F.3d 551, 558-59 (7th Cir. 2003).  The third prong is easily met in this case; thus, the Court addresses it first.  The Seventh Circuit explains that the third prong is met when "the government can show probable

cause to believe the item is linked to criminal activity." Id. at 559. Under Illinois law, a person commits the offense of unlawful use of a weapon when he knowingly carries or possesses a firearm in any vehicle unless the firearm is broken down in a non-functioning state, not immediately accessible, or unloaded and enclosed in a case. 720 ILCS 5/24-1(a)(4). The uncased firearm on the front seat floorboard was clearly incriminating.

The Court turns its attention to the first prong, whether the officers were lawfully present at the time Detective Rogers spotted the firearm. This case does not involve a traditional traffic stop. By all accounts, at the time officers approached the Cadillac, it was parked in a public parking area on Country Club Road. Generally, "[a]n officer needs no reason to look through the windows of a car parked in a public place." United States v. Thornton, 463 F.3d 693, 698-99 (7th Cir. 2006); see also Texas v. Brown, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers."). However, when police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment and must be reasonable. See Whren v. United States, 517 U.S. 806, 809-10 (1996). The Government concedes that a seizure occurred at the point that Sgt. Walker announced "Jacksonville Police" and ordered the occupants of the vehicle to show their hands. Government's

Response in Opposition to Defendant's Motion to Suppress Evidence and to Quash Arrest (d/e 23), p. 4 n.1.  This concession is supported by the record evidence.  "'[A] person has been "seized" within the meaning of the Fourth Amendment . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)).

The record reveals two potentially valid bases for the seizure – (1) probable cause to believe that a traffic violation occurred and (2) a reasonable suspicion of illegal activity.  The Court analyzes each one independently.

The evidence supports a finding that probable cause existed for a traffic stop in that Officer Brune observed the Cadillac turn onto Morton Street without signaling, a violation of 625 ILCS 5/11-804.  The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred.  Whren, 517 U.S. at 810.  In the instant case, the decision was not to stop the vehicle, as it was parked by the time the officers arrived, but rather to approach it.  Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense."  United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000).  Brune was a highly credible witness.  Although Brune admitted that she never intended to issue a citation for the traffic violation, an

officer's subjective motivations are irrelevant as long as probable cause exists to justify the seizure. Whren, 517 U.S. at 812-13. The delay between the time at which Brune observed the traffic violation and the time at which the officers came upon the parked Cadillac was not excessive. The lack of constant surveillance by the officers does nothing to negate probable cause. Although officers briefly lost sight of the vehicle after it turned onto Country Club Road, when they came upon the parked car they recognized it as the same one they had been following a few minutes earlier.

Additionally, it was permissible for Crumley to direct Defendant to exit the vehicle in connection with the traffic stop. As the Supreme Court has recognized, "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car," and thus, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 414-15 (1997). Defendant's failure to show his hands and his furtive movements toward the floorboard made Crumley's direction a reasonable one. The seizure of the vehicle and the direction for Defendant to exit it were supported by probable cause.

Aside from the probable cause relating to the traffic violation, the record reveals that the seizure of the Cadillac was supported by reasonable, articulable suspicion. A police officer is justified in conducting a brief investigative stop of a

vehicle if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968).  In assessing the reasonableness of a Terry stop, the facts are judged under an objective standard.  The Court must consider whether the facts available to the officer at the moment of seizure would "warrant a man of reasonable caution in the belief" that the action taken was appropriate.  Id. at 21-22.  "[A] vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity."  United States v. Navarro, 90 F.3d 1245, 1252 (7th Cir. 1996). Probable cause exists where "under the totality of the circumstances, it is fairly probable that the car contains contraband or evidence."  United States v. Webb, 83 F.3d 913, 916 (7th Cir. 1996).

    The Cadillac and its occupants were seized for Fourth Amendment purposes at the point that Sgt. Walker identified the officers as Jacksonville Police.  At that time, the officers knew about the controlled purchase of narcotics from Meredith's house five days earlier and also that the Cadillac had been parked at Meredith's house the previous night.  The officers believed that the front seat passenger was Shawn Meredith.  As they approached the parked Cadillac, officers observed the driver of the vehicle curse, and they saw the front

seat passenger bend or dive toward the floorboard. The totality of these circumstances justified an investigative stop of the vehicle.

An officer conducting a Terry stop of a vehicle is entitled "to take reasonable steps to insure [his] own safety" and "therefore may order the detainee to exit the vehicle." United States v. Hendricks, 319 F.3d 993, 1004 (7th Cir. 2003). Given Defendant's failure to show his hands and his furtive movements toward the floorboard, it was reasonable for Crumley to direct Defendant to exit the vehicle. Thus, in the instant case, the evidence supports a finding that officers were lawfully present outside the Cadillac at the point at which Detective Rogers saw the revolver.

The Court turns its attention to the second prong, whether the item was in the plain view of the officer. The only record evidence on this point indicates that the revolver was in plain view as Defendant exited the Cadillac. Rogers testified that, as Defendant exited the vehicle, Rogers saw the handgun between Defendant's legs. Sgt. Walker's testimony supports Rogers' in that, after the occupants were secured, Walker observed the firearm laying on the floorboard near, but not under, the front passenger seat in the area of a seated passenger's feet. There is no evidence to contradict these statements. Justin Davis testified that he threw the gun to Defendant as the officers approached and that he had no idea where it landed. There is contradicting evidence regarding whether the passenger side window was up or down as the officers approached the Cadillac.

However, even if the window was up, Rogers could have seen the gun on the front floorboard because the record reveals that the front side windows do not have heavy tint like the rear windows do.  Thus, the evidence supports a finding that the revolver was in plain view as Defendant exited the Cadillac.  Therefore, the seizure of the firearm is valid under the plain view doctrine, and Defendant's Motion to Suppress should be denied.

### III. CONCLUSION

For all the above reasons, I recommend that Defendant's Motion to Suppress Evidence and Quash Arrest (d/e 22) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen (14) days after being served with a copy of this Report and Recommendation.  See 28 U.S.C. § 636(b)(1).   Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   December 18, 2009

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE